CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 20 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

MARK SMYTH,             )
     Petitioner,      )
                    )    Criminal Action No. 3:07-cr-00010
v.                       )
                    )    By:   Hon. Michael F. Urbanski
                    )          United States District Judge
UNITED STATES OF AMERICA, )
     Respondent.    )

## MEMORANDUM OPINION

Mark Smyth filed this motion to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255. He challenges his conviction and 44 month sentence for conspiracy to commit wire fraud, arguing that his court-appointed counsel provided constitutionally ineffective assistance, causing him to enter an involuntary guilty plea. Although Mark Smyth raised no concern regarding the performance of his counsel at his guilty plea hearing, in the months preceding his sentencing, at his sentencing hearing, or on appeal, he now contends his counsel gave him poor advice and coerced him into pleading guilty. Mark Smyth petitions this court for relief, claiming that his guilty plea was the product of intimidation and, as such, was involuntary. After review of all of the evidence in this case, the court concludes that Mark Smyth has not demonstrated by clear and convincing evidence that the statements he made under oath at his guilty plea hearing regarding his counsel and as to his guilt should be disregarded. As such, Mark Smyth's habeas corpus petition must be dismissed.

### I.

Between 1998 and 2001, Terry Dowdell ("Dowdell") orchestrated and operated an investment pyramid (Ponzi) scheme under the auspices of the Vavasseur Corporation

("Vavasseur"), a Bahamian entity. The Securities and Exchange Commission ("SEC") began a civil investigation of Vavasseur and Dowdell in 2001, and the Federal Bureau of Investigation ("FBI") later began a criminal investigation. On November 19, 2001, the court issued a temporary restraining order freezing Dowdell and Vavasseur's assets. In early 2002, after the order was entered, Dowdell persuaded British co-conspirators to wire transfer $850,000 to California bank accounts controlled by Mark Smyth and his brother Greg. Between January and December 2002, Mark and Greg Smyth distributed $350,000 to Dowdell and his family and spent the remaining $500,000 themselves.

On June 4, 2002, Dowdell executed a stipulation acknowledging that his fraudulent scheme raised more than $70 million from over 60 worldwide investors through the sale of fictitious securities, and he distributed millions in Vavasseur funds to business associates, family members, and friends. On December 19, 2002, Dowdell pled guilty to securities and wire fraud.

On July 22, 2002, Fred Heblich ("Heblich"), Dowdell's attorney, wrote the Smyths and asked them to return the $500,000 they received from Dowdell. On August 6, 2002, Greg Smyth faxed a letter to Heblich in which he explained that the money was a loan between old friends to provide seed capital for his company and that it would be repaid.[1] On November 15, 2002, Mark Smyth signed a letter written by Greg containing a false accounting as to how the Smyths had used the money. Both Mark and Greg Smyth were deposed by the SEC in connection with its civil enforcement action against Dowdell. In that deposition, Mark Smyth admitted that the accounting was inaccurate.

On February 28, 2007, a federal grand jury sitting in Charlottesville, Virginia, indicted Mark and Greg Smyth with conspiracy to commit wire fraud.

---

[1] Although Greg Smyth's letter is dated August 2, 2005, the accompanying fax cover sheet is dated August 6, 2002. It appears from the text of the letter and the evidence that 2002 is the correct year.

## II.

Mark Smyth contends his Sixth Amendment right to effective assistance of counsel was violated when his court-appointed counsel, David Heilberg ("Heilberg"), provided erroneous and inadequate advice and improperly coerced and intimidated him to abandon his right to trial and change his plea to guilty. In the Declaration of Mark Smyth appended to his § 2255 petition, he states:

> Due solely to Mr. Heilberg's continuous threats, intimidation, coercion, misinformation, and wholesale failure to properly and effectively conduct himself as my counsel, I changed my plea. Absent counsel's misconduct, I would have gone to trial and presented a meritorious factual and legal defense to prove my actual innocence.

Decl. of Mark Smyth, Dkt. # 391-1, ¶ 4, at 12.

Criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). To establish ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's defective performance prejudiced the defendant. Id. at 687. The errors must be so serious as to deprive the defendant of a fair trial. Id. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. As such, there is a "strong presumption that counsel's performance falls within a wide range of reasonable professional assistance." Id. To establish prejudice, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

When a defendant raises an ineffective assistance of counsel claim following a guilty plea, the prejudice prong is slightly modified. Hooper v. Garraghty, 845 F.2d 471, 475 (4th Cir. 1988). The defendant must prove that there is a reasonable probability that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). A court "can only grant relief under the second prong of Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).

An evidentiary hearing concerning Mark Smyth's § 2255 petition was conducted on March 30, 2011. At the hearing, Mark Smyth focused his testimony on a series of email communications with his counsel leading up to his guilty plea, as well as certain in-person conversations immediately before his plea hearing. The government called Steven Levine ("Levine"), counsel for the SEC, FBI Special Agent James Lamb ("Lamb"), and Heilberg as witnesses at the evidentiary hearing.

### III.

In considering Mark Smyth's allegations of ineffective assistance and coercion, it is necessary to outline the course of the prosecution. Following the Charlottesville grand jury indictment in early 2007, Mark Smyth surrendered to federal authorities in California on March 28, 2007. He was released on an unsecured bond and ordered to appear in this district. He did so on April 25, 2007. Following his arraignment on that date, Mark Smyth was continued on bond and allowed to return to California, where he resided. The court appointed Heilberg, a Criminal Justice Act panel attorney, as counsel the next day.

A month later, on May 31, 2007, Heilberg filed two motions, one to continue the trial and one to pay his expenses to travel to California to meet with Mark Smyth and begin preparation of the defense of his case. In the motion to continue, counsel indicated that he had just received the discovery materials and could not be prepared for trial, had not yet met his client and did not have adequate time to serve subpoenas. Because of the number of defendants and the complexity of the case, the court found that the ends of justice were served by a continuance until late November. The court denied Heilberg's request to authorize his travel to southern California, finding that the motion did not provide proper justification for the particular need for counsel to travel to California.

On September 10, 2007, Heilberg filed a motion to quash and to suppress Mark Smyth's SEC deposition testimony, arguing that Mark Smyth was misled by the SEC into cooperating with its investigation, including giving a deposition without warning of any possible criminal ramifications. The motion sought to exclude use of Mark and Greg Smyth's SEC depositions at trial.

Mark and Greg Smyth and their lawyers met with the government in October 2007. Evid. Hrg. Tr., Dkt. # 515, at 16. The SEC's Levine testified at the evidentiary hearing that "[t]he purpose of the meeting was to inform the defendants of the strength of our case, to provide our case to them, the evidence that we were prepared to produce at trial in the hopes of convincing them to plead guilty saving us the trouble and the resources of a trial." Id. at 60. Special Agent Lamb testified that the meeting's purpose "was to convey the strength of our case or at least give [the Smyths] an opportunity to at least hear what the evidence was." Id. at 71-72. Heilberg agreed that the purpose of the meeting was to "present the evidence and to discuss the possibility of a plea," and noted that the government outlined and summarized the evidence for

the Smyths. Id. at 83-84. Mark Smyth, however, had a different recollection of what occurred at this meeting. He contends that Levine stated at the meeting, "[W]e know you were conned, but this is how we're going to win at trial, regardless." Mark Smyth § 2255 Petition, Dkt. # 391, at 3. Levine denies that he ever suggested that Mark Smyth lacked culpability, testifying at the evidentiary hearing that while Dowdell was the driving force behind the Vavasseur Ponzi scheme, others caught up in the scheme, such as Mark Smyth, were culpable for their own conduct by accepting hundreds of thousands of dollars after the asset freeze and providing false accountings and statements as to the use and disposition of those monies. Evid. Hrg. Tr., Dkt. # 515, at 62-64.

Heilberg testified that prior to this meeting with the government and continuing through the days leading up to trial, he received and reviewed a considerable amount of discovery produced by the government. Evid. Hrg. Tr., Dkt. # 515, at 84-85. Heilberg testified that, given the government's evidence, he advised his client to consider a plea deal because he believed the government would succeed at trial. Id. at 84-86. In contrast, Mark Smyth alleges that after the October, 2007 meeting with the government, Heilberg told him that "he wasn't interested in wasting everyone's valuable time by trying to present any defense on Defendant's behalf and that he [Heilberg] had not bothered to investigate the matter, nor did he intend to, because as far as he was concerned, Defendant was guilty of something." Mark Smyth § 2255 Pet., Dkt. # 391, at 3. Mark Smyth asserts that he did not want to plead guilty, as he believed he was a victim of Dowdell's swindle and that he was "not guilty of abetting someone's theft of funds." Evid. Hrg. Tr., Dkt. # 515, at 18. Mark Smyth asserts he told Heilberg that he was disappointed that the government was not interested in who he was and what his intentions were. According to Mark Smyth, Heilberg replied that "hey, the system's corrupt, get over it, you have to plead up." Id.

At the evidentiary hearing, Heilberg acknowledged his belief that cooperating "witnesses can be corrupt" in conspiracy cases. Id. at 130. Heilberg explained:

> If you saw the words that I've used repeatedly, and I'm going to say – I will just say this. What I really am saying is the witnesses can be corrupt. In other words, criminals, drug dealers, people committing fraud, that sort of thing. So not a great choice of words, but I believe that witnesses can be corrupt in conspiracy cases. I never said the people involved in the system, and it was a poor choice of words to say the whole system, but I do believe – I've been in these trials where the government sprinkles them with holy water, the criminals and co-conspirators who are telling the truth.

Id. After the October 2007 meeting with the government, Mark Smyth returned to California, intent on proceeding to trial. Id. at 19.

Shortly thereafter, on October 25, 2007, Heilberg sent Mark Smyth an email on the subject "Considering a Plea." The email asks Mark Smyth to "[p]lease carefully read the attached Memorandum analyzing the sentence you face and possible ways to cut your losses. I also attached pertinent sections from the Sentencing Guidelines Manual to demonstrate how your sentence is likely to be calculated." Heilberg Emails, Dkt. # 517, Attach. 2, at 32. The detailed memorandum was entitled "Possibility of pleading out." The memorandum recounts discussions Heilberg had with the government regarding its sentencing position following a conviction of Mark Smyth after trial. Based on an analysis of the sentencing guidelines, Heilberg indicated that the government would seek at least five years following a conviction after trial, but that a guilty plea, accounting for acceptance of responsibility and perhaps even substantial assistance, would likely result in a far lower sentence range. In paragraph five of this memorandum, Heilberg advises:

> After reviewing all relevant SEC depositions and relevant discovery, I don't see how, having received so much money, you won't be convicted of at least money laundering after they issue

superseding indictments. Different considerations apply once that is done but, if the calculation of those Guidelines could be more favorable to you, I can lobby for that alternative.

Id. at 34.

After informing Mark Smyth that two co-defendants had completed plea negotiations, Heilberg concludes his memorandum as follows:

> Federal sentences (particularly for frequently prosecuted drug crimes) are particularly harsh. The sentencing ranges that you possibly face are comparatively lenient in this system. Federal prosecutions are almost always fueled by "snitch" testimony by conspiracy participants that, in this District, almost always result in convictions. Although the police and prosecution (the actors) are trustworthy, the system itself, because it most often depends on the testimony of probably dishonest witnesses (in my opinion) is corrupt. Nevertheless, this won't make any difference for you. Please read this Memo and my attachments carefully and, contact me not later than the early part of next week to discuss whether or not you want to attempt to negotiate for a plea.

Id.

On November 1, 2007, Heilberg emailed Mark Smyth to confirm that three of his fellow co-defendants had agreed to plead guilty and a fourth was close to doing so. The government told Heilberg that at least one of these co-defendants, Michael Hardesty, was cooperating with the government and would provide damaging testimony against Mark Smyth and his brother. Id. at 35.

On November 15, 2007, the court denied Mark Smyth's suppression motion, allowing the government to introduce the evidence obtained by the SEC in its civil enforcement action against Dowdell. The court concluded that "[a]lthough they were apparently lied to by Terry Dowdell, the Smyths point to no affirmative misrepresentation on the part of the government that could constitute fraud, deceit, or trickery under the Tweel standard. [United States v. Tweel, 550 F.2d 297 (5th Cir. 1977).] Indeed, the facts alleged tend to support the government's claim that the

SEC acted properly and in furtherance of its civil enforcement action." Memorandum Opinion and Order, Dkt. # 196, at 4.

Immediately thereafter, on November 19, 2007, Heilberg moved for a separate trial based on Bruton v. United States, 391 U.S. 123 (1968), to which the government did not object. Separate trials were ordered for Greg Smyth and Mary Dowdell to begin on November 26, 2007, with the trial against Mark Smyth set for the following week, commencing on December 3, 2007.

Mark Smyth returned to Virginia on November 18, 2007 to attend the hearing on the Bruton motion, which was held the following day. Heilberg told his client via email that the government is "dumping an overwhelming amount of discovery on us and you will need to spend all the rest of [the week following the Bruton hearing] going through it yourself if you want to go to trial." Heilberg Emails, Dkt. # 517, Attach. 2, at 61-62. Mark Smyth did not, however, stay in town to review discovery or help Heilberg prepare his defense. He left for California the day after the hearing, on Tuesday, November 20, 2007. Id. at 64-65. Heilberg indicated in an email that he told his client "no matter what, that he should be here next week to see for himself what goes on [at Greg Smyth's trial]." Id. at 65.

On Tuesday, November 20, 2007, a week before the Greg Smyth and Mary Dowdell trial was to begin, the government emailed counsel for Mark and Greg Smyth and advised them that the deadline for the opportunity to earn substantial assistance was 2:00 p.m. the next day. Heilberg Emails, Dkt. # 517, Attach. 2, at 69. Neither Mark nor Greg Smyth accepted the government's offer of a plea agreement within the substantial assistance window framed by the government.

Greg Smyth and Mary Dowdell's trial commenced on November 26, 2007. Not having heard from his client, Heilberg emailed court staff to see whether Mark Smyth showed up to

watch his brother's trial. Heliberg Emails, Dkt. # 517, Attach. 3, at 5-7. He had not, but Heilberg attended and observed substantial portions of the testimony. After jury selection, Greg Smyth requested that the court allow him to represent himself. The motion was granted with Greg Smyth's court-appointed counsel present in a stand-by capacity. On the third day of trial, November 28, 2007, Greg Smyth changed his plea to guilty after conferring with Mark in California over the telephone. The same day, Mark Smyth gave Heilberg the authority to negotiate a guilty plea. Mark Smyth entered his plea a few days later, on December 3, 2007. There was no written plea agreement.

At the guilty plea hearing, the presiding district judge found Mark Smyth competent to enter a guilty plea. Guilty Plea Tr., Dkt. # 440, at 2-4. Mark Smyth acknowledged under oath that he had ample time to consult with his attorney and he was fully satisfied with his attorney's representation and advice. Id. at 3-4. Mark Smyth also acknowledged that he understood he had a constitutional right to a jury trial at which he would be presumed innocent and the government would be required to prove its case beyond a reasonable doubt. Id. at 4-5. He said he understood that if his plea was accepted, there would be no trial and he would be adjudged guilty of the felony offense with which he was charged. Id. at 5, 7. After hearing all of this, in response to the court's question, "Do you still want to plead guilty?," Mark Smyth replied, "Yes, I do." Id. at 5. The government informed Mark Smyth of the elements of the offense, the maximum penalty he faced, and the impact of the sentencing guidelines. Id. at 6-8. Mark Smyth acknowledged that he understood what the government would have to prove if this case went to trial, the range of punishment provided by law, and the impact of the guidelines. Id. at 6-8.

The government then called Special Agent Lamb to provide a summary of the evidence against Mark Smyth, including his involvement in receipt of wire transferred funds from outside

the United States to bank accounts of which Mark Smyth was a signatory. Lamb testified that Mark Smyth signed a letter purportedly accounting for $500,000 of those funds, which Mark Smyth later admitted was inaccurate in a deposition taken by the SEC. Id. at 9-18. Heilberg was given an opportunity to cross-examine Lamb and asked him several questions. Id. at 16-17.

Immediately following the conclusion of Lamb's testimony, the court asked Mark Smyth, "How do you plead; guilty or not guilty?" Id. at 18. Mark Smyth replied, "Guilty." Id. at 19. The court concluded that Mark Smyth's plea was knowing and voluntary and accepted the guilty plea. Id. at 18-20. The Clerk then read the guilty plea form aloud in open court and Mark Smyth executed the form, which acknowledged that his plea was "made knowingly and voluntarily and without threat of any kind or without promises other than those disclosed here in open court." Guilty Plea Form, Dkt. # 240; see also Guilty Plea Tr., Dkt. # 440, at 19.

Mark Smyth was sentenced on March 3, 2008 to 44 months incarceration. While a number of issues were raised at sentencing, nothing that was said suggested that Mark Smyth's guilty plea was involuntary or coerced. Indeed, Mark Smyth received a two point adjustment for acceptance of responsibility. Mark Smyth remained free on bond pending his appeal. In an email to Heilberg dated the day after his sentencing, March 4, 2008, Mark Smyth expressed satisfaction with his counsel, writing "[t]hank you for yesterday's arguments and your help." Heilberg Emails, Dkt. # 517, Attach. 3, at 44. Later, in an email to Heilberg dated June 23, 2008 concerning payment of restitution, Mark Smyth continued his expressions of confidence in Heilberg, writing "yes I would like you to remain my attorney in this issue, too." Mark Smyth Emails, Dkt. # 521, Attach. 1, at 39.

Heilberg filed a Notice of Appeal for Mark Smyth on March 4, 2008. Nothing was raised in Mark Smyth's appeal concerning the voluntariness of his guilty plea. Rather, the appeal

focused on the appropriateness of an offense level enhancement under U.S.S.G. § 3C1.1 for obstruction of justice.[2] On July 9, 2009, following denial of his appeal, Mark Smyth was ordered to report for service of his sentence.

## IV.

In his § 2255 petition, Mark Smyth contends that Heilberg afforded ineffective counsel by providing erroneous and inadequate advice and by coercing and intimating him to plead guilty. His claim centers on Heilberg's emails dated November 9, 21, 27 and 28, 2007, and a telephone call on November 30, 2007. In his § 2255 petition, Mark Smyth contends Heilberg "was so biased against Defendant's actual innocence that he admittedly failed to take any action to determine the true facts and available legal theories of defense at trial." Mark Smyth's § 2255 Pet., Dkt. # 391, at 9.

Heilberg maintains that because the government had an overwhelming amount of evidence indicating Mark Smyth participated in wire fraud, he encouraged his client to plead guilty and receive a lower sentence than he would have received had he pled not guilty and lost at trial. As to the tone of his communications with this client, Heilberg asserts that the abrupt nature of his messages was tactical, calculated to "confront [Smyth] with the realities of [his] case." Evid. Hrg. Tr., Dkt. # 515, at 107. At the evidentiary hearing, Heilberg elaborated that, "So what I will tell [my clients] is, you may not like how I'm presenting myself or how I'm being aggressive. I'm firing rubber bullets and if we go to trial, the government is firing real

---

[2] Generally, failure to raise an issue on direct appeal results in procedural default of a subsequent collateral review. Bousley v. United States, 523 U.S. 614, 621 (1998). ("[T]he voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review.") An exception exists for claims that cannot be presented without further factual development. See Waley v. Johnston, 316 U.S. 101, 104 (1942) (holding that there was such an exception for a claim that a plea of guilty had been coerced by threats made by a Government agent, when the facts were "dehors the record and their effect on the judgment was not open to consideration and review on appeal."). In this case, the government concedes the applicability of this exception to Mark Smyth's allegations of coercion, transcending his procedural default and requiring review of his allegations on the merits.

bullets." Id. In his own words, Heilberg stated: "It's fair to say that I am – let's make sure – I am blunt and honest, maybe sometimes rude with my clients, but not intimidating." Id. at 121.

At the March 30, 2010, evidentiary hearing, the court ordered that all emails exchanged between Mark Smyth and Heilberg be docketed. The court has reviewed each of these communications and finds that while certain of them are brusque, they do not overcome the presumption of verity associated with Mark Smyth's sworn declarations in open court and render his guilty plea involuntary or coerced.

### 1. **November 9, 2007 Email.**

Mark Smyth asserts that Heilberg put pressure on him to plead guilty in an email dated November 9, 2007 by stating that the case against him "is now verging on overwhelming," that he "previously lied," and that Heilberg was going to ask pretrial services to have his bond revoked, all in an effort to coerce Mark Smyth into pleading guilty. Mark Smyth testified that he was intimidated by Heilberg's reference to changing the terms and conditions of bond in this email, and "felt that if I disobeyed this commandment from him that I was going to be incarcerated." Evid. Hrg. Tr., Dkt. # 515, at 27.

The complete text of the email paints a different picture. Heilberg opens the November 9, 2007 email by noting the entry of guilty pleas by three co-defendants on November 8, 2007, and the need for Mark Smyth to prepare an affidavit detailing the circumstances surrounding the taking of his deposition by the SEC for consideration by the court in connection with the suppression motion. Heilberg Emails, Dkt. # 517, Attach. 2, at 46.

In the full two page email, Heilberg devotes substantial effort to convincing Mark Smyth how important it is to complete the supplemental affidavit needed for the suppression motion and to assist in the defense of his case. Heilberg tells Mark Smyth that he needs to (1) complete the

affidavit; (2) explain what he believes his defense is and why anyone should believe him; and (3) document that he has made travel arrangements to come to Virginia to assist in his defense.

As to this third requirement, Heilberg then emphasizes that "[i]f you want a trial, I must particularly insist on # 3 because I am prepared to ask the pretrial services unit to go back to Court next week to get the terms and conditions of your pre-trial release amended to bring you here to make this happen, or if you disobey this new condition, you will be locked up here before and during your trial so that it will happen." Id. at 47. Indeed, no less than four times in this email, Heilberg emphasizes to Mark Smyth the need to come to Virginia to help him prepare his defense.

In this email, Heilberg outlines the status of the case from his perspective, as follows:

> I spoke again with S.A. Lam (sic) and their case against you is now verging on overwhelming. If you want to go to trial, you will need to travel here to work on your own case before Thanksgiving and stay here continuously through the end of your trial. Two days ago, the government delivered two huge banker's boxes (an intimidation tactic) containing hundreds of pages of transcripts covering 9 days of testimony by Terry Dowdell during the trial earlier this year in Great Britain. Under oath, he indicates that you knew about what he was up to. Even worse, he is already here in this country and lined up to testify against you at trial. If he testifies, the case against you strengthened from a how could you and not know argument to, of course you knew, because the person who exchanged huge chunks of money with you says so.
>
> Fred Heblich, his attorney, will testify about how your letter explaining the nature of your transactions was a lie.
>
> Additionally, Hardesty and Agent Lamb will testify that you told them completely different stories than what you testified to previously under oath at the SEC deposition where, of course, you admitted under oath that you previously lied.

Id. at 46.

Heilberg then tells Mark Smyth that he will face at least 7 to 10 years if he goes to trial versus 3 to 4 years if he can obtain a plea bargain. He concludes as follows: "Nothing else should be more important at this moment in your life than to fulfill each of my requests above in a timely fashion and to devote your full attention to travel here, prepare and defend your case until it concludes." Id. at 47.

To be sure, Heilberg's November 9, 2007, email does not beat around the bush. Indeed, from Mark Smyth's perspective, the consequences he faces, laid out in stark terms in this email, are severe. He either needs to buckle down, come to Virginia and prepare for trial in a complicated wire fraud case or begin the process of plea negotiations. While neither scenario is pleasant, nothing in the email can be viewed as coercive. Certainly, Heilberg's statement that he may need to ask pretrial services to change Mark Smyth's conditions of bond to get him to come to Virginia may be viewed as extreme, but the inference Mark Smyth seeks to draw from this portion of the email is not true to the text. It is plain from the email that Heilberg was not insisting on Mark Smyth's presence in Virginia to plead guilty. Quite the contrary is obvious. Frustrated by the lack of communication with Mark Smyth and the impending trial date, Heilberg told Mark Smyth that if he did not make arrangements to come to Virginia to prepare for trial, he was going to ask pretrial services to change the terms and conditions of his bond to make sure that he was physically present in Virginia to assist in his defense.[3] While certainly blunt, the November 9, 2007, email cannot be read as inappropriately coercive considering Mark Smyth's options less than a month from his felony trial.

---

[3] In fact, sometime around November 19, 2007, Mark Smyth travelled to Charlottesville and briefly reviewed materials provided by Heilberg. According to a Heilberg November 20, 2007 email to counsel for Greg Smyth, Mark abruptly left without completing his review of the discovery. Heilberg Emails, Dkt. # 517, Attach. 2, at 65. He did not attend his brother's trial held the next week.

## 2. **November 21, 2007 Email.**

Mark Smyth suggests that Heilberg's November 21, 2007, email was hostile and inconsistent with his counsel's role as his advocate. He argues that Heilberg's statements:

> [C]aused Defendant to believe that Heilberg had some form of communication with the Judge and that the Judge had expressed a prejudicial pre-determination of Defendant's guilt without benefit of trial or change of plea, and that any attempt by Defendant to prove his actual innocence would be considered a "waste of everyone's valuable time" and that Defendant would be further "punished" for it.

Mark Smyth § 2255 Pet., Dkt. # 391, at 4. Mark Smyth also asserts that this email confirms that Heilberg "had not investigated or developed either a factual or legal basis for [his] defense." Id. at 5.

Heilberg's November 21, 2007 email does not mince words and reflects Heilberg's view of the strength of the government's case and his client's weak bargaining position. The focus of the November 21, 2007 email is that Mark Smyth loses the opportunity to earn substantial assistance if he does not cut a plea deal and agree to testify against Mary Dowdell in her trial, which was set to start in five days. Rather than suggest that he lacked the skill to try the case, Heilberg's email again evinces his frustration with Mark Smyth's lack of cooperation in his own defense. Heilberg writes:

> I am still waiting for you to provide me with your explanation and directions for exactly how I am to defend your case. I asked for this at least two weeks ago. Your delay and obfuscation gives me little confidence that a jury can believe anything we suggest to them because, frankly, I can't believe what you tell me.

Heilberg Emails, Dkt. # 517, Attach. 3, at 1.

Both in written and oral communications with his client, Heilberg projects a somewhat jaded view of the criminal justice system. In discussing the fact that the window to obtain

substantial assistance will close if Mark Smyth does not cooperate in the prosecution of Mary Dowdell, Heilberg writes: "Trial will result in a sentence of 6-7 years or more. More is the operative concept here because if, assuming your brother gets convicted after a trial next week, you then want to go to trial, the Judge will find an excuse to further punish you for wasting everyone's valuable time and resources to try this case twice." Id.

To be sure, the issue of whether to plead guilty and thereby obtain the benefit of a reduction in the offense level for acceptance of responsibility is a consideration that ought to be weighed in an appropriate case. Heilberg's assertion, however, appears to go further and crosses an inappropriate line, suggesting to his client that a court would "punish" Mark Smyth for exercising his right to trial. Such a notion has no place in our criminal justice system. This statement must be evaluated further to see whether it, in combination with Heilberg's other communications, rises to the level of coercion and intimidation warranting habeas relief.

### 3. November 27, 2007 Email.

In his petition, Mark Smyth suggests that Heilberg told him in an email dated November 27, 2007 that he "would not attempt to present any form of adequate defense, and that any such efforts would be ineffectual at best." Mark Smyth § 2255 Pet., Dkt. # 391, at 5. Contrary to Mark Smyth's assertion, Heilberg's email does not suggest that he is not going to put on a defense. Rather, the email tells Mark Smyth that after viewing the trial of his brother Greg Smyth and Mary Dowdell and seeing the evidence that was admitted in that case, raising objections similar to those that were overruled in that case are likely to be ineffectual. Again, Heilberg expresses frustration as to how to defend the case, stating:

> [E]ven a perfectly defended case won't be enough to overcome solid evidence that, after Mr. Heblich's letter notified you about the stay (at the latest), everything that you transferred from that point in time violated the Court's order. I'm at a loss to explain

> what happened differently. If you are waiting to see if Greg will
> be convicted, you are wasting everyone's time. From what I saw
> in Court, this is already inevitable.

Heilberg Emails, Dkt. # 517, Attach. 3, at 11. Heilberg advises Mark Smyth that it was foolish

for Greg Smyth to represent himself and that, based on his observations, Greg would be

convicted. Again, Heilberg addresses with Mark Smyth what he believes to be his best option to

minimize jail time, which is agreeing to testify against Mary Dowdell. Heilberg advises Mark

Smyth that he does not have a lot of negotiation leverage and estimates what Mark Smyth still

may be able to negotiate if he is willing to assist the government. Heilberg Emails, Dkt. # 517,

Attach. 3, at 11-12.

To be sure, Heilberg's email is both critical and blunt, but it continually calls for Mark

Smyth to make a decision as to whether to plead guilty or go to trial. This email was sent one

week after Mark Smyth abruptly left Virginia against his counsel's advice, failing to complete a

review of discovery or otherwise assist Heilberg in his defense. Mark Smyth also had failed to

show up at his brother's trial to witness the government's evidence first-hand, per Heilberg's

request. Mark Smyth's trial was scheduled to begin in a week's time, and he had not given his

attorney the names of any witnesses, see Evid. Hrg. Tr., Dkt. # 515, at 114, or provided any

information with which Heilberg could formulate a defense. Given this context, Heilberg's

November 27, 2007 email is neither ineffective nor coercive.

### 4. November 28, 2007 Email.

Mark Smyth responded to Heilberg's November 27, 2007 email that same evening and

stated that he was leaning toward trial and could not think of anything he could provide in the

way of testimony against Mary Dowdell. Mark Smyth indicated that "I was assured by Dowdell

that the monies I received were not covered by the stay." Heilberg Emails, Dkt. # 517, Attach. 3, at 11.

Heilberg's email response the next day, November 28, 2007, opens by reminding Mark Smyth that he cannot defend all of his actions by relying on Dowdell's representations that the money wired to him was not covered by the stay, stating that the July 22, 2002 letter from Heblich trumps Dowdell's prior oral representations. Heilberg writes that "[t]he pattern of distributions in December, 2002 indicates that you and your brother were coordinating your efforts to steal this money by almost equal distributions to yourselves and your family. $19,200 each to his ex-wife and your son is strong circumstantial evidence that you intentionally looted these proceeds after you received actual notice that these were tainted funds." Mark Smyth Emails, Dkt. # 521, Attach. 1, at 18.

The email continues as follows:

> You are charged with one count of violating the Court's stay (nothing else) and it is no defense whatsoever that you continued to rely on Dowdell's representations after his attorney (Heblich) notified you differently. They are negotiating for Dempsey to testify against you too and, if you don't concede your wrongdoing soon, they will line him up along with your own children. I expect that one or more of them will also testify that you knew about the tainted nature of the funds wired to you even before July 22. Why anybody would put their own kids in that position (daring them to testify against you) is an additional indication (from the jury's perspective) that nothing you say can be relied upon. You won't be the first person in this position to naively believe that your own close family would never testify against a relative to save themselves. Making them testify only cements your children's resolve to go through with it because undertaking this wasteful trial proves to them that you care more for yourself than them. If you are relying on your own children's promises that they would never testify against you, then you taught them well how to lie whenever it serves their self interests. Furthermore, your claim that you continued to rely on Dowdell, after Heblich's letter, is simply unbelievable even without the Government's use of those personally close witnesses against you. In other words, you will be

convicted even if they don't bring in your children and Dempsey (though I believe they will).

I've been doing this for 28 years and know what to expect. The arrogance of people (like you) who have never before been involved with the legal system in this way but who have conveniently avoided previous troubles by having no inhibitions about their lies to others and themselves, never surprises me.

Id. at 18-19.

Heilberg was questioned by the court at the evidentiary hearing about the fact that the tone and language used in this email could have caused his client to believe that his own lawyer was out to get him. Heilberg responded:

I understand he might feel that way, but I'm also trying to honestly comment on what I'm seeing and telling him what he needs to hear, not what he wants to hear. My concern at that point was I'm still looking for something to show – his defense is that he didn't know. He got all this money and I think I said something to the effect of when you receive that much money as a loan and it's not for buying a house or mortgage or something like that, the common sense of most people is you're going to need to document its legitimacy. It was well over 500,000. So I said, throughout, you've got to document that. Did you repay him? Did you attempt to repay him? Can you show that it was spent for a business purpose? It was not clear to me it was spent for anything but personal expenses. This is all in the government's case.

The refutation of the accusations never came. So I think I'm frustrated at this point. I've been calling for defensive evidence and information and all I'm getting is "I want to go to trial, I'm innocent." So I'm frustrated. No question.

Evid. Hrg. Tr., Dkt. # 515, at 118. Heilberg's rationalization notwithstanding, the accusatory tone of his November 28, 2007 email is troubling, particularly when viewed in isolation. As with the November 21, 2007 email, the November 28, 2007 email must be evaluated in the broader context of the Mark Smyth prosecution.

### 5. **Heilberg – Mark Smyth November 30, 2007 Conversation.**

Heilberg's November 28, 2007 email was sent at 7:45 a.m. At 11:49 that morning,

Heilberg emailed a memorandum to Assistant United States Attorney Jean Hudson ("AUSA

Hudson"), advising that he had actual authority to enter into a plea agreement. Heilberg Emails,

Dkt. # 517, Attach. 3, at 14-15. On that same day, Greg Smyth, after conferring with his brother

on the telephone, changed his plea to guilty mid-trial. In another email to AUSA Hudson later

that same day, Heilberg argued that Mark Smyth was entitled to substantial assistance because

his telephone conversation with his brother Greg "directly lead (sic) to Greg Smyth's change of

heart today in the midst of his own sinking ship." Heilberg Emails, Dkt. # 517, Attach. 3, at 18.

As to the motivation for his guilty plea, Mark Smyth testified as follows:

> I showed up for trial a week later and my brother's trial was over
> by the time I got there. He had changed his plea in the middle of it
> and then Mr. Heilberg was very insistent on me changing my plea
> and he suggested that whether it's true or not, I do not know, he
> suggested that if I didn't change my plea, then Ms. Hudson and the
> machine would go after my son, my daughter and my mother with
> indictments and I could see at that juncture that anybody indicted
> has now no chance, as I was feeling at the time, and to be honest
> with you, Your Honor, I still feel that way.

Evid. Hrg. Tr., Dkt. # 515, at 30. Mark Smyth testified that he arrived in Virginia on November

29, 2007, the Thursday before the first day of trial, set for Monday, December 3, 2007. Id. at

32. Mark Smyth testified that in a face-to-face conversation on Friday, Heilberg "was giving me

the full court press on changing my plea and I was waffling." Id. at 33. According to Mark

Smyth, Heilberg told him:

> [T]here was no way I could win. He would put on a good show,
> but the circumstantial evidence against me was so large that there
> was no way I could win and that the judge would probably give me
> 5 to 7 years and his advice was they're going after your kids and
> your mother and I could see that's when I had to throw the towel in
> myself.

Id. at 33. Following this conversation, Mark Smyth claims he decided to change his plea to guilty and so advised Heilberg.[4] In response to questions from the court, Mark Smyth confirmed that these four emails and the November 30, 2007 conversation with Heilberg pressured him into pleading guilty against his will:

> It was a progression, Your Honor. It was a progression from "you ought to do this" to "you ought to seriously consider this" to "if you don't do this you're a bad person" and then progression to "man, if you don't do it, they're going to go after you and the rest of your family."

Id. at 37-38.

Mark Smyth testified that no one from the government ever suggested to him that they would go after his family if he did not plead guilty. Id. at 34-35. Levine of the SEC testified that Mark Smyth's family was never the target of an investigation as a result of their receipt of funds from Mark or Greg Smyth. Levine testified that their names may have come up concerning the "need to speak with them about that money and maybe seek to recover those funds that had been provided to family members. But even with respect to that, we actually never pursued funds made directly to family members." Id. at 67. Levine had a vague recollection about a conversation with Mark Smyth's daughter about "perhaps needing to potentially call them as a witness in connection with their having received funds." Id. Levine indicated that he was not aware of anyone informing Heilberg of any intention to prosecute any of the relatives of either of the Smyths. Id. at 67-68. Levine noted further that prosecution of the Smyth brothers' family members was not considered internally among the prosecution team. Id. at 70. Special Agent Lamb testified that he was not aware of evidence implicating the Smyth brothers' family such

---

[4] The timing of this conversation, during which Mark Smyth was allegedly pressured into changing his plea, does not add up. According to Mark Smyth, this conversation occurred in person on Friday, November 30, 2007. But two days earlier, on Wednesday, November 28, 2007, Heilberg indicated in an email to the government that Mark Smyth had given him authority to enter into a plea agreement.

that they would be targets of a criminal prosecution. Id. at 72. Nor was he aware of anyone making any statements to suggest that Mark Smyth's family would be prosecuted if he did not plead guilty. Id. at 72-73. Lamb stated that he believed that two of the Smyth brothers' children were slated to testify at trial. Id. at 73.

For his part, Heilberg confirmed that he was told by someone that the government had looked at Mark Smyth's family and that they were lucky that they were not prosecuted. Id. at 126. Heilberg's recollection was clouded as to the specific nature of the statement regarding Mark Smyth's family, Evid. Hrg. Tr., Dkt. # 515, at 124-128, but he recalled evidence presented at the Greg Smyth trial as to the Smyth's disposition of the $500,000, including to family members. Heilberg testified:

> What I'm getting is – I'm trying to remember. I would have seen that at trial and there would have been a conversation with somebody about it during the trial. So given the time of the phone call, if it happened on that day, it was something that came up in the context of the trial and there was a discussion about it with somebody. Sort of unofficial. Not a meeting. It might have been during a recess.

Id. at 129-30.

On Monday, December 3, 2007, Mark Smyth tendered his guilty plea in open court. He testified at the habeas evidentiary hearing that he recalled the judge asking him questions about whether his plea was free and voluntary, but he said he was in a fog. He described being "intimidated to the max, standing in front of a judge, worrying about my family." Id. at 39. Yet Mark Smyth raised no concern about coercion or intimidation at his guilty plea hearing, in the months leading up to sentencing, at his sentencing hearing, or on appeal. The court credits Heilberg's testimony regarding the statement about Mark Smyth's family and finds it does not rise to a level of coercion or intimidation.

## V.

Mark Smyth argues on brief that the "words and tenor of the emails fall below any objective standards of reasonableness." Mark Smyth § 2255 Brief, Dkt. # 526, at 9. Mark Smyth contends that his intention all along was to go to trial, and that "[b]ut for the progressive and unreasonable pressure by Heilberg to change the plea, [Mark] Smyth would not have done so." Id.

While certain of the communications between Mark Smyth and his counsel are out of line, the bulk of Heilberg's email communications fall "within the range of competence demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970). The vast majority of the emails are legitimate efforts by Heilberg to assess the strength of the government's evidence. A number of Heilberg's emails request Mark Smyth's assistance with the defense of his case. As time went on and the trial approached, Heilberg's communications increasingly take on a frustrated tone, as Mark Smyth insisted on going to trial but apparently gave his lawyer nothing with which to work. Despite Heilberg's insistence, Mark Smyth did not actively assist in the defense of his case in any meaningful way, nor did he attend the trial of his brother Greg to witness the strength of the government's evidence first-hand. Given the absence of any substantive defense, it is no wonder that Heilberg's emails continue to press Mark Smyth for a decision either to plead guilty or come to Virginia to assist in his defense.

This finding does not excuse, however, the tone of certain of Heilberg's emails to his client. For an officer of the court to suggest that the system is corrupt or that the trial judge would punish a defendant for exercising his constitutional right to trial has no place in our criminal justice system. Such statements do not stem from a lawyer's frustration with his uncooperative client; rather, they suggest a deeper malaise with the practical operation of our

system of justice. Even if a practicing lawyer holds such misplaced views, they should not be shared with a client facing a criminal charge who is relying on the lawyer's experience and judgment in dealing with the prosecution and the court. In this case, while the Heilberg emails contain a few such sentiments, on balance and in the aggregate, the court does not believe that they rise to the level of coercion or intimidation rendering Mark Smyth's guilty plea involuntary.

Mark Smyth's claims of coercion are undermined by his own affirmative statement that he was not threatened or coerced by anyone into entering a plea. Although he was not asked specifically about coercion during the guilty plea colloquy, the guilty plea form that bears his signature and was read to him in open court acknowledges that his plea was "made knowingly and voluntarily and without threat of any kind or without promises other than those disclosed here in open court." Guilty Plea Form, Dkt. # 240; see also Guilty Plea Tr., Dkt. # 440, at 19.

Mark Smyth's own words and actions concerning Heilberg's representation also undermine his allegations of coercion and ineffective assistance. Significantly, Mark Smyth stated under oath at his guilty plea hearing that he was satisfied with his counsel's representation and advice. The day following his plea, Mark Smyth wrote Heilberg and thanked him for his arguments at the guilty plea hearing. Heilberg continued to represent Mark Smyth during his appeal and, at his client's request, during subsequent issues concerning restitution.

Mark Smyth pled guilty without any reservation. Immediately before entering his plea, Mark Smyth heard the summary of the government's evidence against him, put on through the testimony of Special Agent Lamb. Special Agent Lamb testified that after the account freeze order was entered, $850,000 in funds subject to that order were wire transferred from outside the United States to accounts controlled by Mark Smyth and his brother Greg. Mark and Greg Smyth split the monies with the Dowdells, retaining $500,000 for themselves. In July 2002,

Mark and Greg Smyth were contacted by Dowdell's attorney and asked to account for the funds. Four days later, Mark Smyth and another individual opened a new account and transferred $250,000 of the wired funds into that account. Subsequently, the Smyths corresponded with Heblich, Dowdell's counsel, advising that the wired funds were a loan between old friends. In November 2002, Greg Smyth wrote, and Mark Smyth signed, a letter to Heblich containing a false accounting as to the disposition of the funds. Special Agent Lamb testified that Mark Smyth acknowledged in his sworn SEC deposition that this accounting was inaccurate. Guilty Plea Tr., Dkt. # 440, at 9-18.

While Mark Smyth was not asked specifically whether he agreed with these facts, he assented to this factual recitation by his action immediately following Lamb's testimony: Mark Smyth entered a plea of guilty without raising any objection. He did not challenge the voluntariness of his guilty plea at sentencing or on appeal, nor did he maintain that he was actually innocent of the crime charged. Even now, Mark Smyth offers nothing to suggest that he was innocent of the offense charged except the conclusory statement that he was a victim of Dowdell's scheme and was "not guilty of abetting someone's theft of funds." Evid. Hrg. Tr., Dkt. # 515, at 18. He has offered nothing to suggest that the factual summary provided by Special Agent Lamb at the guilty plea hearing was inaccurate in any respect or could not be proven.

Mark Smyth has not proven by clear and convincing evidence that the statements he made under oath at his guilty plea hearing concerning his satisfaction with counsel, the voluntariness of his plea, and his guilt, should be disregarded. Representations of a defendant at a guilty plea hearing "constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison,

431 U.S. 63, 73-74 (1977). "[C]ourts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." United States v. Bowman, 348 F.3d 408, 417 (4th Cir. 2003). "Thus, in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established." United States v. Lemaster, 403 F.3d 216, 221-22 (4th Cir. 2005). In the absence of clear and convincing evidence to the contrary, Mark Smyth's statements under oath at his guilty plea hearing are binding. Fields v. Att'y Gen. of State of Md., 956 F.2d 1290, 1299 (4th Cir. 1992).

Finally, Mark Smyth contends that he was coerced to plead guilty out of fear that if he did not, his family could be prosecuted. Both the SEC's Levine and Special Agent Lamb testified that no such prosecution was considered, much less communicated. At the same time, each mentioned that Mark Smyth's family members were prospective witnesses as to receipt of the Dowdell funds, and Heilberg's emails likewise mention the burden associated with family members testifying in criminal prosecutions against fellow family members. Heilberg recalled evidence from the Greg Smyth trial concerning the receipt of monies subject to the freeze order by Smyth family members. In this context, Heilberg's statement to Mark Smyth that he was fortunate that his family members were not prosecuted is credible and does not rise to the level of coercion or intimidation.

In sum, the court finds, after considering the testimony of the witnesses and scrutinizing the emails between Heilberg and Mark Smyth, that the representation provided by Heilberg did not fall below an objective standard of reasonableness and did not prejudice Mark Smyth. While the court is troubled by the tone of certain of Heilberg's emails, it does not believe that they infect the voluntariness of the guilty plea and constitute extraordinary circumstances warranting

habeas relief. As the court stated in <u>Hess v. United States</u>, Nos. 1:07cr245, 1:08cv902, 2009 WL 2029760, at *6 (E.D. Va. July 9, 2009):

> Advising a client to plead guilty and take advantage of the potential sentencing reductions attendant on a guilty plea when it is clear that the Government will be able to prove guilt at trial does not fall below an objective standard of reasonableness. Nor would the results of the proceedings have been different had Petitioner pled not guilty. In fact, had Petitioner decided to take this case to trial, the results would have likely been worse; he would not have the benefit, at sentencing, of accepting responsibility for his crime.

<u>See also</u> <u>United States v. Liverman</u>, 117 F.3d 1415 (4th Cir. 1997) (unpublished table decision); <u>United States v. Cullen</u>, 943 F.2d 50 (4th Cir. 1991) (unpublished table decision). Even now, Mark Smyth offers nothing to suggest that he was actually innocent, that the evidence presented by the government at the guilty plea hearing was inaccurate, or how he proposed to defend the charges leveled by the government at trial. In this case, it cannot be concluded that the result of the guilty plea proceeding was fundamentally unfair or unreliable requiring habeas relief.

For these reasons, the court finds that Mark Smyth is not entitled to habeas relief. Mark Smyth's motion to vacate, set aside, or correct his conviction and sentence pursuant to 28 U.S.C. § 2255 will be **DISMISSED** by separate Order entered this day. Additionally, after reviewing pertinent portions of the record, the court finds that petitioner fails to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. § 2253(c). Accordingly, a certificate of appealability is **DENIED**.

Entered: October 20, 2011

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge